You seated? Let me call the case. Mr. Brown, you may proceed. Good afternoon, Justices. My name is Don Rimmer. I'm with the Law Firm of Mike Adams, the Executive Director of the Woodbridge Park District. May it please the Court. At its core, this appeal involves an excess accumulation tax rate objection case against the Woodbridge Park District's 2017 Levy for its general fund, 8% of the 70 ILCS 1205-5-1. In accordance with the Supreme Court's decision in Miller and this Court's recognition of a two to three times threshold for establishing a nefacia case in the Belk and Twentler cases, there was no excess accumulation within the WPD's general fund at the time of its 2017 Levy, as the Miller ratio was just over one. As such, the WPD should have been granted summary judgment at the trial court level. Nonetheless, the trial court granted summary judgment to taxpayers, finding an excess accumulation within the sub fund of the WPD's general fund without any statutory authority or common law precedence for the same. The crux of the matter is that the tax rate objections are filed against the levies and not funds, in accordance with 35 ILCS 200 23-15. Here, the Applebee's own tax rate objection complaint states that they are filing a tax rate objection against the WPD's levy made in accordance with Section 5-1 of the Park District Code. Applebee's have done their best to claim the distinction between a general fund and a corporate sub fund, tying themselves up in was made in accordance with Sections 5-1 and 5-3 of the Park District Code. This levy was not for a sub fund. It wasn't for the corporate sub fund. It was a levy made in accordance with 5-1 and 5-3 for the WPD's general fund. Whether the Park District refers to this fund for which it holds the extension as its general fund or a sub fund, the Park District voluntarily creates sub funds within its general fund for its own internal bookkeeping purposes. And they have no obligation to do that? No obligation. There's no statutory obligation to do that. No obligation to call a sub fund a corporate sub fund? No, that's correct. What do you say about this argument that you're essentially converting the cause of action of the bill of the plaintiffs? Rewriting the complaint? Correct. If you just look at the tax rate objection complaint, I'm just quoting from the tax rate objection complaint. The tax rate objection complaint is objecting to the $3.9 million levy. And if you look at the 2017 levy ordinance that was passed by my client, you'll see the $3.91 million, which is a combination of their corporate fund, capital replacement, and capital development sub funds. But have the working of the WPD never adopted this internal accounting of sub funds within the first place? We wouldn't be here because we would just have one single general fund with a middle ratio of just over one. The WPD's levy authority stems from the Park District Code. Sections 5-1 and 5-3 provide for the WPD's authority to levy for general or corporate purposes. The WPD refers to this fund as its general fund. The IDOR and the county clerks refer to this very same fund as the corporate fund. Each year, the WPD levies for its general fund in accordance with Sections 5-1 and 5-3 of the Park District Code. And correspondingly, the county clerks of DuPage County and Will County extend for the corporate fund, as they call it. Within the general fund, Section 1205-5-1 of the Park District Code provides that the WPD may levy for all corporate purposes, as well as levy for building repairs and improvements. Although not mandated by statute as we covered, Your Honor, the WPD has created sub funds within its general fund to allocate between its corporate, capital replacement, and capital redevelopment sub funds. I have a question. Yes, sir. On that issue. Yes. Aren't capital replacement and capital redevelopment both corporate purposes? Not if you read the section of the Park District Code which says that my client can actually levy for those purposes beyond its corporate purpose. It's all, I would say, a general levy, but the levy for corporate purposes is separate and distinct from the levy for capital replacement and capital redevelopment. And the reason I say that is I noticed that there's no definition of what it means by corporate purpose. So, frankly, I pulled it out of the last law dictionary, and it's the most broad. It's like you can, once you levy those funds, they're to be spent on, it's pretty much any purpose for running a nice park. The language is so broad, I was under the conclusion, you can call these accounts whatever you want, but as long as they're appropriate, it's all corporate purposes, all free, but I could be wrong. I would agree, Your Honor, I'm just referencing that there's separate authority in this section of the Park District Code that specifically refers to those purposes. So if you do additional levies, that wouldn't be part of the general levy? It's all one single levy under that code section, 5-1, so it's not a separate levy. It's just separate purposes within that own distinct levy. From there, the WPD deposits receipts from the county clerks to its general fund, and then it allocates those funds amongst those three sub-funds. Again, that's for its own internal bookkeeping purposes. Could you have just called them accounts instead of funds? It doesn't really matter, they're just a legal fiction, if you will, and that's why... That's my point, if they had decided to go in initially and set this up, just on paper or whatever, in your article of incorporation, just call them accounts. They didn't have to use the word funds, did they? No, they did not. I'm frankly referring to it as a sub-fund, just to help define it in court practice, but it's not as though the WPD refers to it as corporate sub-fund. They just refer to them in the levy process, and then they have separate accounts within their processes and procedures. Under the Miller case and its progeny, an excess accumulation tax rate objection is one in which a taxpayer alleges that the subject taxing district has more than enough funds on hand to serve its current purposes, making the corresponding levy unnecessary. The Supreme Court in the Miller decision outlined a basic test to determine whether an excess accumulation has occurred. A review in court will analyze the audited statements of the taxing district to review the total funds on hand at the time of the subject levy, taking the latest audited financial balance sheet for that fund and adding to it the amount of any prior levies that have not yet been received by that corresponding fund. This equals the total funds on hand at the time of levy, and the review in court will compare the funds on hand to the trailing three-year average annual expenditures of a specific fund. The review in court will compare those funds, and as expressed in this Court's opinions in the Belk and Toynton cases, if the funds on hand are more than two to three times the three-year trailing average annual expenditures, then the taxpayer is met its burden to establish a prima facie case. If a prima facie case is made by the taxpayer, then the burden shifts to the taxing district to establish why an accumulation fund was actually necessary. In this case, the appellees are seeking to hold as unlawful the 2017 WPD's levy of roughly $3.9 million for its general fund, while only comparing the corporate subfund balances and expenditures. The primary issue with the taxpayer's entire theory of this case is that, again, tax rate objections are not filed against funds, and certainly not subfunds, but rather the underlying levies. 35 ILCS 200-2315B specifically provides that tax rate objections are filed against taxes, assessments, and levies. Here, the taxpayers are filing their objection against the levy for the general fund. Taxpayers did not address this statutory argument in their appellee's brief. I think that's a glaring omission. There is no precedent in Illinois common law that would permit a tax rate objection to be filed against a subfund. This is because there are no levies directly attributed to a subfund. The levies fund the overall fund for which they are extended. Here, the WPD general fund is the fund to which the levy is made under Sections 5-1 and 5-3 of the Part District Code, not the corporate subfund. Since there is no separate or distinct levy for the WPD's corporate subfund, there is no statutory basis for a tax rate objection to declare the WPD's levy for its general fund. This has been unlawful, especially when there is no excess accumulation within the general fund overall. Alpha Gamma Rho, and in the application of the common law cited by the taxpayers in their appellee's brief, do not stand for the principle that the appellee suggests, that a tax rate objection may be filed against a subfund of an overall fund. These cases stand for the premise that a tax rate objection cannot be filed against multiple levies involving multiple funds in a single tax rate objection. Judge Belford, in his sister filing in the DuPage County Circuit Court, said, looking specifically at the Alpha Gamma Rho and O'Connor cases, talking about running the Miller analysis on a fund-by-fund basis, that the court's understanding of what those cases mean, by fund-by-fund, is they're talking about a fund for which there is a specific corresponding levy. Here, what we're dealing with is one such fund for which there are essentially, for purposes of internal bookkeeping, subfunds. At that, there is only one fund for which a levy was issued in this case. That's Judge Belford's words. The DuPage County Circuit Court got it right. Another matter that the Will County Circuit Court ruled incorrectly in this case, is that the circuit court granted summary judgment to the taxpayers after the trial court found that the appellees had made a prima facie case on the Miller. The only issue before the court during the summary judgment phase was whether the Miller ratio was just over one, as the WPD was arguing, or whether it exceeded three, as the appellees were arguing. The WPD filed its motion for summary judgment first. It wasn't a cross motion, as the appellees have referenced in their brief. The taxpayers should have filed a response to the motion for summary judgment, rather than a cross motion for summary judgment. If the circuit court denied the WPD's motion for summary judgment, then the burden would have shifted from the taxpayer to the WPD to submit evidence in support of a need to accumulate in its general fund. The WPD was never given this opportunity to trial court. We only need to look to this court's rulings in in re-application of O'Connor and Toten, for the principle that a showing of funds on hand being two to three times the average annual expenditures, only rebuts the presumption that a taxing district's levy was lawful. In both of those cases, this court remanded the case to the trial court to allow for the taxing district to present evidence of a need for an accumulation of funds, after learning that the taxpayer had indeed made a prima facie case for excess accumulation. In Toten's court specifically said, we also determined that ComEd was not entitled to summary judgment. ComEd's evidence that the funds contained excess accumulation does not automatically prove that the challenged tax levies were illegal as a matter of law. The record reveals that no evidence was presented below regarding the taxing body's need for accumulations in the challenged funds. The township and the district did not present this evidence in the circuit court because they contended and the court agreed that ComEd had not met its burden. This is exactly the case here. The WPD at all times at the circuit court level contended that the taxpayers had not met their burden of establishing a prima facie case because the Miller ratio for the general fund was only one, just over one. And then, we believe this is a simple matter. The statutes and caseloads do not permit tax rate objections to be filed against the WPD's voluntarily created corporate sub fund. Tax rate objections are filed against levies. Since there is clearly no excess accumulation associated with the WPD's 2017 levy for its general fund, under sections 5.1 and 5.3 of the Park District Code, the more levy issued is lawful and this court should reverse the decision of the trial court and grant the WPD summary judgment under both Miller and this court's own precedent. If the justice has any other questions, we'd be happy to answer them. Justice, one more question and then this will probably go cold. But obviously, I understand your argument about maybe you shouldn't have been in the position of competing summary judgments. But when you are in that situation, it means that both sides agree there are no consistent issues of fact. Obviously, when you guys say this is simple, one thing that comes to mind is the fact that my tax objectors have their calculations. You have your calculations. It's just numbers that are plugged in, but I assume you yourself can test with those numbers. The numbers are all valid. No one is saying that anybody is using the wrong number. It's just they're plugging in the wrong number in the middle of the ratio. The only exception to that, Your Honor. 700,000. Well, no, that is the Applebee's argument. The only exception I have is if you look at their figures, the Miller calculation involves taking the funds on hand and adding property taxes that have been levied but not yet received. So when the Applebee's added the amount of property taxes that have not yet been received, they added the full amount from the general fund, not just that was allocated to the corporate itself. You're saying the whole level? The whole level. Yeah, right. And that's what I'm saying. And that's what I'm saying is no one can test the numbers. In other words, their number of 3.9 million is the same as what you're using. That's what I'm saying. I would just contest that their funds on hand is still incorrect because they added the entire property taxes level. Otherwise, we are in agreement there's nothing else of that issue. Thank you. Thank you, Your Honor. Mr. Carnes. Good afternoon, Your Honor. This is Jim. This is Albert. This is Peterson. I'm Evan Carnes, Evan B. Carnes II. Carnes and I started out here with my partner, Reverend Martino, Sunday after tax day, who responded briefly to Professor Peterson's question a moment ago. There were, in fact, other contested issues at the trial court. And at the trial court, regardless of Mr. Venner's opinion that they weren't properly filed as cross motions for summary judgment, they were and they were taken that way and, in fact, they were briefed that way. And in our motion for summary judgment and in our supporting responses, we presented my affidavit along with the publicly available audited records of the Park District, as well as the publicly available records of the Park District's roughly monthly, not necessarily the monthly meetings, and their forecasts of their business and whatnot. Your Honor will all remember that Miller was much more than just an equation that the Supreme Court created. It also created a safe harbor, if you will. And that safe harbor was, even if this equation exists, there may still be an opportunity for the district to defeat an excess accumulation objection. That opportunity is if there's an unknown but possibly unanticipated need for the funds to be applied for some other purpose. Nothing within any publicly reported document of the Woodbridge Park District, nothing within their own executive director, Mr. Adams' affidavit, identifies any other need, identifies any other known but unanticipated or anticipated but unknown possible purpose for these monies. It's important because in my affidavit and in our review of all the documents that we filed, and by the way, the documents were filed by both sides, pretty much the same documents. The financial reports, the audits, et cetera. They're both in the record from each side, and we refer to them together. So we raised the whole issue of was there an alternative defense that the district might have beyond just pure calculation. They never responded to that. And under the case law in Illinois, their failure to respond to that admits anything that's properly raised and documented. It was put up or shut up time, and they didn't put up time. Let's go to the legal question. I thought that was one of them. Let me go to the legal question. I'm more interested. Let's go your way. They're all important. There's only one levy here. There's not three sub-levies or however you want to characterize it. How do we focus on a sub-account, if you will, and not the entire levy? How do we cherry-pick and just look at that one sub-account? I know they call it a corporate account, but the reality is that this levy, as it has been argued, is a levy that subsequently the monies are divided into these three accounts, but there's only one levy. So how do you get the focus solely on the money in the one sub-account? I think it's a multi-faceted answer, if you don't mind. Sure. If I go wrong and you want some more information about something else, let me know. The multi-faceted answer is the park district, like any other taxing district, has only those powers to tax that are granted by the legislature. The legislature doesn't grant a power to tax a general tax. It grants power to tax for corporate purposes. It grants a power to tax for capital development or for capital refurbishment or repair purposes. And then there's nine others. They're listed in the brief. I don't have to worry about them. The point of the matter is Woodridge Park District is a matter outside the record, but it's the only district in my experience doing these prosecution of these tax bases for over 12 years that uses this general purpose account. My comment to you is the general account basically compiles all the three levy rights, their capital development, their capital replenishment, their repair, and their corporate. So they're combining them all. In our analysis, we did exactly what they do, exactly what their executive director, Mr. Adams' affidavit says he did. He gets the levy and puts them back into the three accounts, the three that the legislature permitted them to levy for. So the fact that they decide to levy as a, quote-unquote, general, and Mr. Renner makes a big issue out of this, I believe it's really red herring, the Illinois Department of Revenue and the kind of clerk levies it as a corporate levy because that's the authority the legislature granted, corporate levy. And to the extent that somebody doesn't designate it for the individual other purposes, because, as I said, there's 10 other purposes they have the right to levy for, they're going to get it extended by the clerk under the IDOR handbook guidelines as corporate. But, just as I said a moment ago, they treat it as though it's the levy for each of those purposes just as every other part of the district does except they send them out as individual levy. So the reason I think it's appropriate to treat these this way is it's exactly what Connor, excuse me, Alpha Gamma Rho, sometimes confusing the Greek alphabet, says should be done. Treat it individually. And treating it individually, both of you, Justice Peterson and Justice Dunway, I believe asked the question, treating it individually, we don't have any substantial material issue on numbers. As a matter of fact, in one of my briefs, I admit that whatever number they said it was, it was what was being sought in the judgment. We agree with that calculation. If we had a typo or we transposed a number or my dyslexia kicked in, not an issue. We can resolve that. The issue we want to get back to is what was going on here. And from our standpoint, as I said, we raised the issue of was there another defense that might have been available to the district, and if so, what was it? And our initial affidavit specifically said nothing's been presented to us. Now, they're not entitled to, or they're not required, excuse me, to file an answer to a test complaint by statute. I pointed that out. But they are required in the face of a motion of summary judgment to bring forward some substantive basis for why they should not be granted summary judgment against them, why we should be granted summary judgment against them. And they did not do that. I think that's fatal to that part of the argument. With respect to Toynton, that's exactly what Toynton said. Toynton said this comment did not bring forward anything. We have. That's why that portion of Toynton doesn't apply. With respect to the remainder of the case, calculated our way, as Justice Peterson pointed out, if you're comparing corporate to the corporate portion of the levy that was attributed by, and historically, year over year over year, the district has done the same thing. They cut it into three slices of pie and put one in corporate, one in capital redevelopment, and one in capital building. With respect to that, we think we've done it the right way. And we did it the way they did it. They accounted for it that way. There was a question that's a little bit off point here, and I hope you'll take my apology for saying it's off point, but this whole issue of fund versus an account, it's because fund accounting is a concept that's used by the CPAs and by the auditors to track governmental money. Because realistically what happens, most governments have a large fund, all the money's in an account, and what they're doing is segregating how many million is in fund A versus how many million is in fund B. So they're called funds because that's just the municipal charter. Exactly. That's all it is. So I think you didn't answer this, but I just want to ask you again. Oh, I'm sorry. No, no. What if no fund, sub-funds were created? What if, put apart this to just operate out of a lack of a better word, putting a general fund, a corporate fund that's just one basket of monies? I perceive that to be an accounting auditing question, and I can't answer that. Theoretically they could. If they could, you have no argument. If they couldn't. If that's what WPD had done here, would we be sitting here with the case right now? Under Miller. The ratio. Based on the dollars at issue under Miller, no. We would not be here. That is the question that you want to answer. That is my question. Based on the dollars and a simple equation analysis of Miller, we would not have a almost two or just over two, two, three or whatever ratio. And just so I'm clear, in this particular case there was one levy. There was one levy, but if you actually look at the record that's presented here, you will see that the budget that was certified includes a levy for the three funds we're arguing about today, and then separate levies for a few extra funds. Can a taxpayer challenge those certifications, or can they only challenge the levy? The latter is true, Judge. The legislature only set up a right for a tax objector to file an objection to a levy based on the existing fund and the monies available in that existing fund. Does that not inform our analysis? It does, and I think you should go my way, because it should inform you that way. I don't know if I've answered all of your questions, because you and I have. Absolutely. Justice Albright? So it seems kind of circular to me. You're challenging the levy, but there was one levy, and you're saying that it's an excess accumulation because they put them in different – because of the way they put them in funds? I'm saying that unlike the commonly performed practice in the state of Illinois for governmental districts of this nature, they issued several separate taxing levies as one. They had – in our brief, we provide you the tax authority levy that the legislature allows them. They combined three of those into one and called it their general. They make a big issue out of the fact that IDOR and the county clerk's office pulls it back out and does not say it's general. The county court and the IDOR say it's the corporate levy, because that's where their authority lies in the legislature, a corporate levy. For a corporate levy, a capital replacement, a capital development levy. They combined them, and so we deconstructed the application so that we can actually see what money was levied to a corporate, what money went into capital development, what money went into capital replacement. And you can see it, and it's identified that way in Mr. Adams' own affidavit, which is a record. He says, as soon as we got it, we put it back into the three where it belonged. Now, I think that's exactly what the court in O'Connor and in Poynton said, and in Millard. You look at an individual fund basis, and the fact that they might have operated under an unusual arrangement shouldn't change the fact that those monies were levied for no specific purposes as only they could be by the legislative branch. But in those cases, you just cite it. This is not a rhetorical question. Were they all individual levy cases? In other words, you're right there. It's not a rhetorical question, but you're right. They were all individual levy cases, and that's part of my point here. They've avoided or evaded or whatever you want to call it by accumulating it into one levy, and when we do exactly what they do when they receive their money and deconstruct it, clearly there is an accident. But more importantly, they've argued they need to kick this back into Poynton and let them have another bite of the apple. If you look at the record before you, they've waived that. They didn't challenge any of the materials that we submitted. They didn't confront my affidavit. They didn't say any of the materials that we submitted, which were publicly acceptable, publicly filed, publicly required, if you filed an opulence, and they don't say we had these other purposes that this would have been legitimate for. Unless there's no other questions. Thank you for your time and your attention, Justices. Pleasure to be here again. Thank you. Mr. Renner, do you wish for a vote? Yes, Your Honor. Thank you. Just a few points, Your Honor, because I think some of the answers that were given by my colleague, I think, do probably make more sense. And you see why he motioned for summary judgment that was denied at trial court publishing. Thank you, Your Honor. Applebee's are suggesting that Miller creates a safe harbor and that taxing districts can, after the prima facie cases, determine and present evidence to the fact that there was reasons for having to do the excess accumulation. And Applebee's counsel is saying that we didn't do that at the trial court. If you look at all of the briefs, every single brief says we are not required to provide that information unless and until the taxpayer has met its burden of establishing a prima facie case. We always contended that the error ratio was just a little over one and it's clear as day, if we were right, then the prima facie case was not established. So we weren't required to present all of the documentary evidence. I would submit to you that we could. And when you look, on the one hand, that we're not required yet to do that. How does the Applebee's, how do they get to cherry pick, as Your Honor provided, Justice? Those are the words I used in the trial court because that's what they're doing. They're cherry picking from the corporate sub fund to establish an excess accumulation case when there isn't one. Could we operate out of the general fund and just the general fund? Could the WPP just have levied the general fund? Of course, yes. And that was the point that I had said earlier that we wouldn't be here today if we had done that. Let me ask a quick question. Sure. Could you do individual levies for those three sub funds? No, they are not individual levies. They are a levy under 5-1 of the district court. They cannot do separate levies. No, we cannot. Unless there are any other questions, I think those are the points that I wanted to cover in the file. Thank you for your time. Thank you very much. The court would like to thank both sides for their arguments. The matter will be taken under advisement and an opinion will be issued in due course. Thank you very much. Court is adjourned.